## JOHNSON et al. v. BUMPASS et al. (No. 1272.)

(Court of Civil Appeals of Texas. Beaumont. July 13, 16, 1925. Rehearing Denied. Oct. 14, 1925.)

**1. Wills ☞792(3)—Knowledge of rights and intention to elect necessary to "election" by widow to take under will.**

Two things are necessary to amount to election by widow to take under will: First, she must have knowledge of her rights, that is, she must have had knowledge of condition and extent of estate and duty to choose between inconsistent rights; and secondly, it must be shown that she intended to elect between such inconsistent rights.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Election.]

**2. Wills ☞792(1)—Whether widow had elected to take under husband's will held for jury.**

Where widow entered into possession of community estate, claiming under will, but did not know she had right to elect against will, and had not appropriated to herself more of community estate than she would have been entitled to under partition, and where she did not understand condition and extent of estate at time of probate, it could not be said, as matter of law, that widow had elected to take under will, but such issue should have been submitted to jury.

**3. Deeds ☞78—Defendants not entitled to instructed verdict based on quitclaim deed, where plaintiffs testified that execution was fraudulently procured.**

Where defendants claimed under quitclaim deed, and their evidence fully sustained validity of such deed, they were not entitled to instructed verdict thereon, in view of plaintiffs' testimony that deed was fraudulently procured, and issue thereon should have been submitted to jury.

**4. Wills ☞794—Widow not estopped to claim community estate, where she had not received under will more than she would have received from equitable partition of estate.**

Widow *held* not estopped as matter of law from claiming community estate of husband, where she had not received under will more than she would have received from equitable partition of estate.

**5. Husband and wife ☞273(10)—Defendants' claim to be innocent purchasers for value against plaintiff's claim to community interest not sustainable.**

In action to recover property, defendants' contention that they were innocent purchasers for value as against plaintiff's community interest in land could not be sustained as matter of law, where person through whom such claim was advanced knew condition of estate or could have discovered it on reasonable inquiry.

Appeal from District Court, Kaufman County; Joel R. Bond, Judge.

Suit by Carrie Nelson Johnson, joined pro forma by her husband, E. P. Johnson, against Ed R. Bumpass and others. Judgment for defendants, and plaintiffs appeal. Reversed and remanded for new trial.

Wynne & Wynne, of Kaufman, for appellants.

Bumpass & Wade, of Terrell, for appellees.

WALKER, J. This suit was instituted by appellant Carrie Nelson Johnson, joined pro forma by her husband, E. P. Johnson, against E. R. Bumpass, Joel R. Bond, and W. C. McCord, to recover the title and possession of 169 acres on the E. English survey, 50 acres on the Galbraith survey, and the following tracts on the Ransom Sowell survey: One of 343 acres, one of 66 acres, one of 167 acres, one of 8.8 acres, and one of 89 acres, all in Kaufman county, Tex. The appellants are negroes.

Carrie alleged in her petition that this land was the community property of herself and a former husband, J. R. Nelson, deceased; that as a survivor of that community, there being no children, she owned all of the land in controversy, but, if mistaken in that, she was entitled to her one-half community interest.

The defendants answered by pleading the will of J. R. Nelson, which, in substance, was as follows:

(1) He directed that all of his just debts should be paid, including the expenses of his last illness, out of the proceeds of his life insurance, if sufficient, but, if not sufficient, then the balance to be paid out of the notes belonging to his estate, especially directing that certain notes devised to his bastard daughter, Ethel Cooper, should not be resorted to for that purpose.

(2) He devised to his daughter, Ethel Cooper, certain property, both real and personal.

(3) Under this paragraph he devised certain property to a bastard son, Robert Bennett. The balance of his will, as affecting the property in controversy and the rights of Carrie in and to the estate, was as follows:

"Fourth. I give to my wife, Carrie Nelson, the right to use, occupy and to collect and enjoy the income from the following described real estate, to wit: All the lands which may be owned by me at the time of my decease in the Ransom Sowell survey in Kaufman county, Texas, same, at this time, consisting of about 515 acres; also the 120 acre tract of land which I own in the survey situated in Kaufman county, Texas, being about five miles south from Kaufman, same having been purchased by me from John Reasonover; also the 48½ acres of land in a tract owned by me in the Mary Galbraith survey in Kaufman county, Texas; which right herein given to her, the said Carrie Nelson, shall be and continue during the term of her natural life and so long as she remains unmarried; provided, however, that should she at any time remarry, that the right hereinbefore given and granted to her shall thereupon at once terminate, and she shall thereupon, have no interest or right whatever in the lands mentioned in this paragraph, immediately upon the remarriage of my said wife, if such event should occur, and if she does not remarry, then when she shall die, I direct that the real estate mentioned and described in this paragraph number four shall become the property, in fee simple, of my nephews and nieces, to wit: Eliza Higgins, Richard Higgins, Robert Roman, Guf Roman, Willie Roman, Angeline Roman, Lottie Taylor, Charles Nelson, Arvelia Jackson, Fern Nelson and Henry Bailiff, share and share alike, that is, to each of them a one-eleventh interest in the said lands mentioned in this paragraph, to them and their heirs in fee simple forever.

"Fifth. I do hereby give, bequeath and devise all the remaining property of which I shall die seized and possessed, whether real, personal or mixed, separate or community, after the payment of the foregoing legacies and the allotment of the foregoing lands, to my wife, Carrie Nelson, same to be hers absolutely in fee simple forever—it being my will and desire that she accept this bequest and devise in lieu and settlement of her community interest in a portion of my estate.

"Sixth. I hereby direct that if any legatee or devisee under this will shall make any contest of the same, either in the courts or by seeking, otherwise, to annul any of its provisions that such legatee or devisee shall, receive no bequest or devise, and shall not inherit any portion of my estate; but the portion which such contestant is allotted herein shall, in such event, descend according to the laws of descent and distribution to the other heirs to my estate.

"Seventh. I constitute and appoint my wife, Carrie Nelson, my daughter, Ethel Cooper, and Ben Allen, as executors of this my will, and I direct that no security shall be required of them as such executors; and it is my will that no other action shall be had in the county court in the administration of my estate than to prove and record this will, and to return an inventory and appraisement of my estate and list of claims.

"In witness whereof, I have hereunto set my name on this the 14th day of Sept, A. D. 1916, in the presence of W. P. Allen, and Robt. L. Warren, who attest the same at my request.

                                        "J. R. Nelson."

The defendants further alleged that Carrie elected to take under the provisions of this will, and after so electing married her coplaintiff, E. P. Johnson, thereby forfeiting her interest in the land in controversy. They further plead that Carrie and her husband had executed a quitclaim deed to Bond and McCord for the interest of all the defendants, thereby divesting themselves of all title to the land in controversy. They also filed certain pleas of estoppel and innocent purchaser.

The appellees, by their plea, claimed to hold under and for the nieces and nephews of J. R. Nelson as named above in the fourth paragraph of his will.

When the case was called for trial, the plaintiffs took a nonsuit, but over their objections the case was forced to trial upon what the trial court construed as a petition for affirmative relief filed by the defendants as a part of their answer. Appellants then answered the cross-action of Bumpass et al., pleading, in substance, the same facts as set forth in their petition. Also certain of the nieces and nephews named in the fourth paragraph in the will intervened under order of the court.

At the conclusion of the evidence the trial court submitted to the jury the following charge:

"Gentlemen of the Jury:

"It appearing to the court in this case that the defendant Carrie Nelson Johnson by the undisputed testimony elected to take under the will, and acquiesced in all of its provisions, and it further appearing to the court by the undisputed testimony that she executed a deed to the said property in controversy by which, and through which, the title to the property became vested in Ed R. Bumpass and the interveners herein, it is the opinion of the court that she ought not to recover in this case; therefore, the court instructs you to return a verdict for the defendant Ed R. Bumpass and the interveners in this case, and the form of your verdict will be as follows: 'We, the jury, find in favor of Ed R. Bumpass and the interveners herein for the land in controversy.' And the form of your verdict will be signed by the foreman, using the following form: 'We, the jury, find in favor of Ed R. Bumpass and the interveners herein for the land in controversy.'

"On the question of rents claimed by Ed R. Bumpass and the interveners herein, I instruct you as follows: That there is no sufficient proof authorizing the recovery of rents in this case by the defendant and the interveners, and you are therefore charged to return your verdict on that issue as follows: 'We, the jury, find for Carrie Nelson Johnson and Edgar Johnson, and against Ed R. Bumpass and the interveners herein, on their claim for rents.'

"The form of your verdict will be as follows: 'We, the jury, find for Carrie Nelson Johnson and Edgar Johnson, and against Ed R. Bumpass and the interveners herein, on their claim for rents.'

"————————, Foreman.
"J. S. Woods, Special Judge."

And upon the verdict so returned judgment was entered in favor of appellees for the land in controversy.

Appellants complain of the action of the court in forcing them to trial on appellee's cross-action. Also, they complain of the admission of certain evidence and of a defect in parties. As we construe appellee's brief, they concede error in the admission of the evidence, but contend that it was harmless in view of the instructed verdict. There was no error committed in forcing appellants to trial on appellees' cross-action, nor was there any defect of parties, but, in view of the disposition we are making of the case on other issues, it is not necessary to discuss these assignments further. In our judgment, the trial court erred in instructing a verdict in this case, for the following reasons:

(1) Carrie Nelson Johnson, as a matter of law, had not elected to take under the will of her deceased husband. The community estate of J. R. and Carrie Nelson, at the time of the death of J. R. Nelson, appears to have been worth about $150,000. Senator Warren had been Nelson's legal adviser long prior to his death, and immediately after his death read the will over to Carrie, and explained fully to her its terms and conditions. With this information, Carrie joined the other executors named in the will in its probate, filed an inventory and list of claims, and claimed the property devised her under the will. Also, she conceded to the bastard children named in the will, Ethel Cooper and Robert Bennett, the property devised to them. The will was executed in 1916. J. R. Nelson died in 1917. Carrie secretly married E. P. Johnson in Rockwall county in 1918, and after her marriage continued in possession of the land in controversy, being the land described in the fourth paragraph of Nelson's will, and collected the rents for about two years, at which time she told Mr. Allen, one of the executors, of her marriage to Johnson. During this time Johnson had lived in the house with Carrie, had boarded with her, and had his washing done there, but ostensibly as a boarder. After Allen learned of the marriage of Carrie, he got in touch with the

nieces and nephews named in the will who lived in other states, and bought the interest of nine of them at $2,000 each. Soon afterwards, these nieces and nephews filed suit in the federal court to cancel these transfers from them to Allen, but that suit was settled by these heirs buying back their interests from Allen, paying him $22,000. This money was raised by Judge Bumpass, he advancing $4,000 of his own money and $18,000 being advanced with the land as security. Carrie knew that Allen was buying out these nieces and nephews, and when he had bought them surrendered possession to him of the land in controversy.

After Judge Bumpass, who represented the nine interests purchased by Mr. Allen, had compromised his lawsuit with Allen, he requested Judge Bond, who in the meantime had purchased one of the interests, to secure from Carrie and Johnson a quitclaim deed to the land in controversy, which Judge Bond did. After the execution of this quitclaim deed, Judge Bumpass then demanded from Carrie the rent on the land during the two years she held it after her marriage with Johnson. From the confusion and misunderstanding growing out of this condition, Carrie instituted this suit, as we have already said, claiming all the land as the survivor of community, and, if mistaken in that, then a half interest. Under her evidence, it is clear that she went into possession of the community estate claiming under the will, and claiming the property devised to her under the will, but her evidence clearly raises the issue that she did not know that she had the right to elect as against the will, but believed that she was forced to hold under the will. She testified that a short while before she instituted her suit in 1923, Judge Bumpass told her that she could have elected and claimed her half interest in the community estate. She testified that Senator Warren, though explaining to her the terms of the will and her rights under the will, did not explain to her that she could claim her one-half community interest as against the provisions of the will. She further testified that no one had ever explained to her her legal rights, nor did she know her legal rights until just before this suit was instituted. Under her evidence, it took all the insurance and all of the notes, which possibly amounted to $30,000 or $40,000, to pay the debts of J. R. Nelson. While she took the other personal property owned by the community estate, the evidence does not show its value, nor from the inventory filed does it appear with any reasonable certainty the value nor character of such personal property. She also took possession of other real estate besides that in controversy, and sold some of it. We think it reasonably appears from the evidence that in selecting this property she has not made more than an equitable partition between herself and the es-

tate; that is, that she has not sold more than would have been her reasonable interest had the estate been partitioned.

In conceding to the bastard children the property devised to them, in which, had she elected not to take under the will, she had a half interest, she has released, so far as we can determine from the evidence, to these heirs more than has been appropriated from the estate. As we understand the record, Carrie has not appropriated to herself more of the community estate than she would have been entitled under a partition, nor any portion of the estate which might not have been awarded to her on partition, except the rent on the land in controversy during the time she had it. A large part of this rent she put back in improvements on this land. Also, from her evidence, and from the will itself, we think the issue was raised that Carrie did not understand the condition of the estate at the time she probated the will.

[1, 2] On these facts, the trial court should have submitted the issue of election to the jury. Speaking for the Commission of Appeals, Judge German said in Dunn v. Vinyard, 251 S. W. 1046:

"In the absence of statutory regulation, it may be generally said that two things are necessary in order that acts relied upon will amount to an election: First, the party must have had knowledge of his rights; that is, he must have had knowledge of the condition and extent of the estate, and of his duty to choose between the inconsistent rights; second, that he intended to elect, as shown by his words and acts, viewed in the light of all the circumstances."

From our review of the evidence, it is clear that neither of the conditions suggested by Judge German appeared in this case as a matter of law. The inventory of the estate showed vendor's lien notes and other notes of large amount, and also life insurance. All of this, under Carrie's evidence, was consumed in paying the debts. As said, the issue was raised that Carrie did not know when she probated the will that it would take all of the personal property to pay Bob's debts. Also, the issue was raised that Carrie did not know that she had the right to elect between her inconsistent rights, that is, the right to hold under the will, or the right to claim her half interest in the community property. She said, positively, by her testimony, that she did not know that she had this right, and did not learn it until shortly, some two or three weeks, before this suit was filed. Not knowing that she had a right to elect against the will, it could not be said as a matter of law that she "intended to elect, as shown by her words and acts, viewed in the light of all the circumstances." It seems to us that Dunn v. Vinyard, on its facts, is absolutely on all fours with the facts of this case, if anything making a stronger case in favor of election than we have here. See,

also, Packard v. De Miranda (Tex. Civ. App.) 146 S. W. 211, which cites with approval Watson v. Watson, 128 Mass. 152; In re Goessling's Estate, 287 Mo. 663, 230 S. W. 613; Egger v. Egger, 225 Mo. 116, 123 S. W. 928, 135 Am. St. Rep. 566; Logsdon v. Haney (Ky.) 74 S. W. 1073; Goodrum v. Goodrum, 56 Ark. 532, 20 S. W. 353; Clark v. Hershey, 52 Ark. 473, 12 S. W. 1077; generally, Cen. Digest, "Wills," §§ 792, 793.

[3] (2) As a matter of law, appellees were not entitled to an instructed verdict under the quitclaim deed from Carrie and her husband to Judge Bond et al. They testified that when they signed this deed Judge Bond represented to them that it was to him only, and only for the purpose of curing his title to the interest that he himself had bought; that they did not know that they were conveying any interest whatever except the Bond interest; that Judge Bond falsely and fraudulently concealed from them the fact that they were conveying all their interest in the land. While appellees' evidence in this case fully sustained the validity of this deed and clearly showed good faith upon the part of Judge Bond in his dealing with Carrie and her husband, the evidence of appellants raised an issue of fact which should have gone to the jury.

[4] (3) From the statement made above, we do not think that estoppel as a matter of law could be urged against Carrie. An issue was raised that in value she has not received from the estate under the will more than she would have received had the will not been probated, and, except as to the rent for the time she held the lands, nothing that she would not have received from an equitable partition of the estate.

[5] (4) Appellees contend seriously that they are innocent purchasers for value as against Carrie's claim of her community interest in the lands. We are somewhat at a loss to understand how this issue of innocent purchaser as a matter of law could arise. Appellee Bumpass, through whom this claim of innocent purchaser is advanced, was conversant with all the facts in this case before he bought into this land or became interested in any way therein, had lived in the same town with Carrie and her husband, Bob, for many years, had done some legal business for Carrie, knew the terms and conditions of the will, and knew the condition of the estate, or at least the issue was raised against him that he could have discovered all of these things upon reasonable inquiry. However, he says that, inasmuch as Bob referred to Ethel in the will as his daughter, and Carrie had recognized the bequest to her, that he had the right to deal with the estate on the theory that she was the legitimate daughter of Bob. Even if he had that right, and concede to him as a matter of law all conclusions that could be drawn on the issue of innocent purchaser from this evidence, it

could relate only to Bob's half interest in the community estate. Certainly, as a matter of law, he could not have become an innocent purchaser against Carrie's right to elect not to hold under the will, in view of the condition of this record.

For the reasons given, this cause is reversed and remanded for a new trial.